The first case for argument this morning is 15-1825 GPNE v. Apple. Mr. Nelson, whenever you're ready. May it please the Court, and I have reserved five minutes for rebuttal. Yeah, we'll keep the clock starting at 5.50. The District Court's fundamental error here was on the interpretation of the term no. It made two errors, either of which requires reversal here. First, over GPNE's objection, the District Court used the word pager, thereby leaving open a claim scope argument that allowed Apple to argue that a pager has legacy-type pager characteristics that are contradicted by the intrinsic evidence. But you didn't present any claim construction proposal that said, well, if you use the word pager, you have to put non-legacy before it? What we did do was in our Markman brief, we said, Your Honor, if you use the word pager, it's going to beg the question and it's going to create ambiguity. And that's on JA 510 of the record in our Markman brief. We specifically told the District Court that the word pager would create an issue. And in fact, in our objections to the jury instruction... Did you propose any language, any curative language? I mean, you had your initial claim construction proposal, but now we were playing off of a different chart. So did you propose any language to clarify pager so that it wouldn't lead to these ambiguities? Yes, Your Honor. In the hearing, and this is on JA 1577, so in our briefs on 510, we said it's going to beg the question. At the hearing, now, Apple says that we conceded to the use of pager. That is absolutely not true. And on JA 1577, what we said is it would not be an issue using the word pager if pager is, quote, as broad as meaning contacting someone. And then we went on literally in the next sentence and said, but we think that our definition of node is preferable because it will not create ambiguity. That's exactly what we said at page 1577 of the transcript. Am I misremembering something? I thought the judge asked did anybody think that the term pager needs to be construed, and nobody really spoke up at that moment. Look at pages 1570 through 1577 of the JA. That's how Apple characterizes it. That's just not true. We went, and the district court at the Markman hearing asked the questions. It asked Apple's counsel the questions, and Apple was responding on a back and forth. And the district court said, isn't this just going to kick the can down the road in the district court's terminology? And Apple said no because pager means more than just a pager, effectively. There's more to the claim than just a pager. And our counsel stated that, look, if you use pager, of course, if you say pager means just contacting someone, then that's not a problem. But we think our definition of node is better, devices that can transmit and receive information, is better because it captures the entire context of the patent. And that's exactly what we were afraid of. That's what we flagged to the district court in our Markman brief. That's what we continue to flag to the district court throughout the trial. So I don't think it's fair. I understand how Apple characterizes it, but it's not fair to say that the district court said, well, give me a definition of pager. And if we did, we did it anyway in 1577. But regardless, this court and the O2 decision and in others have clearly stated that once you object at the Markman hearing, and we did not just have the hearing but in the briefing, and point out the fact that there is an ambiguity, then we have made our objection. But we didn't just do that. If you go to the objections to the jury instruction, and this is JA 26273 through 26277, we specifically stated that Apple's presentation, quotes, creates an O2 problem. We flagged it to the district court not just during the Markman but throughout the trial that there's an O2 problem. And then we said the curative way to deal with this issue is to give our construction of the term node, which is devices that can transmit and receive information, which captures the true scope and context of the patents. So that, I think, is why there is no waiver here. This is not an issue. Remember, this is a term within a term, right? We did not want the term pager in the construction for this very reason. We did not want there to be an ambiguity. And, in fact, it was sort of a two-step move here, right? It was first Apple proposes a construction that creates ambiguity by using the term pager. And then Apple, the district court, excuse me. Well, pager appears like 200 times in the specification, right? I mean, the pager didn't just, the district court didn't make up that term. It appears in the specification. In fact, in lieu of node, which only appears in the abstract, right? There is no doubt, and we have never argued anything other than the word pager appears in the specification. But it's not just pager in the abstract, no pun intended. It's pager as combined by the specification. And what the district court missed, I think, was that in the context of this particular patent, that a pager is not just a legacy pager. So, for example, it has features like, and this is all in Column 14, it has features like data compression and decompression. And Figure 8 has a pressure-sensitive keypad. It has all these features that just did not exist. And to use an analogy. But you had quite a lengthy trial. I presume you did or you had the opportunity to draw that out, either through your own witnesses or through cross-examination, right? We absolutely did, which is why there's a problem. The jury decided claims failed here. The entire battle at trial was on what does a pager mean? It wasn't whether the devices are pagers or not. It was what does a pager mean? And by the way, the district court didn't even say, in the instructions, what does a pager mean in the context of the patent. That was over our objection. It didn't even say that. It was what is a pager? It used a plain and ordinary meaning at the time of the patent. And so we had both sides. We had Apple saying, for example, that a pager means that it has to be high power, despite column 14 in the specification, which specifically talks about low-power devices. We have Apple talking about how there can be, for example, the wattage. Let me ask you. In your proposed instruction, let's assume, let's take just the first part of it. If the district court had adopted the first sentence, all that says is you have to apply the plain and ordinary meaning after reading the entire patent and the file history. If the district court had accepted that and given that instruction to the jury, where would we be left? Is that any different? I mean, it would depend on everything that had gone down in trial in terms of describing what a pager is and the difference between a pager and a legacy pager, right? Two answers. Number one, yes, that alone would have made a difference, because Apple's presentation was man-on-the-street-type testimony. They asked their witnesses, is this a pager or is this not a pager, despite admittedly not having read the specification at all. But number two, and I think more importantly, our objection was not just on that in the jury instructions. Our objection at the jury instructions and at Markman. Can I ask, it seems to me that you had a couple of different objections. One is asking for baking in plain and ordinary meaning in the context of the specification of prosecution history. I'm a little puzzled about whether it would ever be permissible to give that to the jury. That's an express invitation to do a claim construction as opposed to ordinary customary meaning, which is the meaning you all carry in your heads and you're not doing any contextual. Is there precedent for giving that kind of instruction to the jury? Please do a claim construction analysis. Well, we are in uncharted. I don't think so, Your Honor, in the sense of. But I do want to guess. But that's a problem for me on that proposal. The other thing that you proposed was to ask, and I forget whether you did this in the jury instruction, but you did this at some point. You said, Judge Koh, in your claim construction opinion, you said something about how a single device can actually operate on two different networks. Please put that in the instruction. As far as I know, those are the two specific things that you requested other than, please go back to our original claim construction proposal that doesn't use pager at all. Do I have this state of the record right? That is correct. There were two parts, and you accurately stated what we asked for in our jury instructions. And I don't want to overlook your last point, which is we did ask to go back to our construction, which we think is the correct one. But, yes, that is correct. And so because of that, I mean, the problem is the trial became an issue about what is the exact scope of the word pager. So if I have a problem with the proposal about telling the jury to analyze all of the intrinsic evidence wherever you find it, then I'm left to thinking about your other proposal, which is very much focused on the operate independently, the network portion of the claim construction. Correct. So why is it not within a trial judge's pretty broad discretion here to conclude, look, the words that I gave, operate independently, captures the point well enough. And you can argue about independence and network, and I want to ask you about that. But just on the instructional point. Well, what I think it's still, that's still a claim scope to go to the jury, because the issue still was, can you have a device that does data, and what does operate independently mean? Which is not just applying it to the facts. It is clearly a question of claim scope based upon the patent. Well, part of what the district judge had to conclude in deciding whether the original operate independently instruction was good enough on this point was whether Apple actually not only inched up to the line many times, but crossed the line and actually suggested something that was misleading on it. I'm not sure that it's beyond the trial judge's discretion. She was actually sitting there, and we weren't, to conclude that here Apple never quite crossed that line. Well, I think that that's, look, at trial you had competing experts talking about this, including the operate independently, about what it means. What does, can you share resources, despite the fact that, for example, figure one and three showing the data network sharing resources with the telephone network. You had literally arguments on this term by looking at the rule 131 declaration about this particular issue in operating independently. And that's why it was definitely even on that particular issue, claim scope, but putting aside the issue, by the way, that, of course, we vehemently disagree with the fact that operate independently was in the term to begin with and made that objection clear as well. But even assuming that the district court was right on that threshold issue, that it still became an issue of open claim scope because the district court was allowing the jury to hear competing arguments. You had Apple's expert on one hand talking about the rule 131 declaration and how that must mean that it's operating independently because this is on JA657, it's the rule 131 declaration. And then you had, starting at 657, and then you had our expert and our witnesses talking about how the exact opposite was true. That, in fact, all it meant was that you pick up a call, or that you pick up a telephone with the state of the art, and this goes back to the patent itself and the specification, is we were effectively making the same arguments to the jury that we made at Markman about what does operate independently mean. And that is entirely inappropriate even on the phrase operate independently. So that's why I think that even on operate independently, even assuming that you think it belongs in the construction, even though we think it does not. I mean, keep in mind, I know I'm running short on time, but I do want to get this point out on operate independently, that there is a separate claim element for the network, and that's the data network in the claim. What the district court did here is it imported the limitation on network into the definition of the device of the node, which is entirely inappropriate. And so because of that, even if you assume that the district court was correct on that point, it still left open the exact same claim arguments that both sides made about interpreting the prosecution history. And that's why, Judge Toronto, I think we are in a little bit of uncharted territory, where, of course, we have to say it's not just plain and ordinary meaning. It's plain and ordinary meaning in the context of the patent, because that's what was missing from all of this. So I'm happy to continue to take questions. I do want to reserve a little bit of my time to respond. Just one question. There's a bit of discussion, I think it's at 842 in the main post-trial opinion, that refers to testimony by Dr. Wilson, which in turn refers to some back and forth in a re-exam about the difference between packet-switched and circuit-switched telephone networks. Is there anything in the patent that indicates that when it talks about telephones and telephone networks, that it is limiting its characterization to the old circuit-switched network as opposed to the, even I think by 1994, already on the scene packet-switched telephone network? The answer, by the way, I will answer that. You're wrong on the last point, which is there was only circuit-switched in 1994. GSM was on the scene. And the telephone network, that was a key point, was that it was only circuit-switched. Is there evidence on that, on that particular timing question? Yes. And I can get you a site in my rebuttal. But let me give you a couple sites in the transcript that just were the PTO. And this is a critical point. The Patent and Trademark Office used handheld computer art to satisfy the term, the element, node. Now, it found that the claims were still valid both originally and in the re-exam because of the other claim elements on the two-factor authentication. But at the transcript, not in the JA, but in the transcript at 1390 and 1391, there is testimony about how the word, node, that the handheld computers were used, not just pagers, but handheld computers were used to satisfy the term, node. And so, now, of course, and by the way, the Rule 131 declaration was filed to swear behind prior art that was a handheld computer. So, in that sense, and I believe it was on GSM. I know there was GSM prior art that we got around because of this very issue. So, now, to be clear, and I think what Apple is going to say, is that the district court, excuse me, the PTO rejected a packet switch, circuit switch distinction. But it did affirm the fact that node can be met by a handheld computer, number one, and not just a legacy pager. And number two, if you look at the context, both in column one, talking about the state of the art, which was generally one-way legacy pagers, and using the telephone to call back. And number two, if you look even at the Rule 131 declaration, which talks about the passive device and how it was a passive device, and this was two-way data communication using, and it talks about switching in the actual Rule 131 declaration. I think that's why we think it's clearly packet switch, which is what they're trying to get around at a minimum, if it's not just picking up the phone and calling. Thank you. Thank you. We'll be still hearing about it. Thank you, Your Honor. Thank you. Good morning. Good morning. May it please the Court, my name is Lauren Fletcher and I represent Apple. The key claim construction dispute here was whether the claim term node must be limited to pagers. The district court correctly construed the node as limited to pagers and provided 11 separate reasons supporting that construction. I'm happy to go through the intrinsic support for that, but counsel's argument focused more on the O2 micro issue, so I'd like to turn to that first. Well, can I say it's, I guess, related to the O2 micro issue. This is, I guess, my understanding even before the trial started. It's perfectly apparent that if you look at normal claim construction materials, using the word pager is a perfectly fine thing to do. It's all over the specification. It seems, on the other hand, as though that word is extremely likely to trigger misleading thoughts in the mind of a ledger. What's the right approach to claim construction if both of those premises are true? So, here I think Judge Koh took exactly the right approach. First, she viewed the claim construction dispute that was presented to her by the parties, and that primary dispute was whether nodes must be limited to pagers or not. At the Markman hearing, she asked if either party required or requested a further construction of the word pager. Apple said no. There's going to be a fact issue about whether Apple's iPhones and iPads operate on a telephone network or a paging network, but that's a fact issue. And GP&E never said, no, Your Honor, we think this is a claim construction dispute where you need to provide further guidance on the word pager. The one issue that did come up at the Markman hearing was whether the pagers would have to be limited to legacy pagers or not. And Judge Koh dealt with that issue. At the Markman hearing, she said, well, what about if I add in the requirement that these pagers have to be two-way pagers that offer two-way data communications? That resolves the issue of excluding the legacy pagers that were distinguished in the patent as prior art, the long-wave pagers that were in the prior art. So Judge Koh specifically put in the requirement of two-way data packet communications to show that this wasn't just an old legacy pager. She also added the requirement that, based on the intrinsic record in the inventor's own statements, that the pager has to work on a paging system that operates independently from a telephone network. So with that guidance, Judge Koh did present enough information for the jury then to be able to make a factual determination as to whether Apple's products operate as nodes. GP&E's suggestion that the district court should have done more is both waived and wrong. First, the district court correctly found waiver. GP&E made the strategic choice throughout this case to argue that the clean term node should not be limited to pagers at all. It never asked the district court to provide further construction, despite several opportunities. For example, at the Markman hearing, which I just discussed. Also, at summary judgment, Apple moved for summary judgment of no infringement and in opposing that motion, GP&E acknowledged that there was a factual dispute and that there would be a factual dispute for trial as to whether Apple's products were pagers that operated on a paging network. That was at page 82758 of the appendix. GP&E won that motion and that's why we went to trial. During the trial, GP&E had plenty of opportunities to again raise this issue and say there's a claim construction dispute as to what the word pager means and we require further construction. Well, I think in the first half of the argument, I said my recollection of the record was that they made two requests that were pretty clearly formal requests for once the trial got started. One had to do with the operate independently and adding a couple of sentences from Judge Koh's claim construction opinion and then the other was the plain and ordinary meaning in the context of the specification and prosecution history. Do you agree that those two requests at least were made? That's correct and those are the two specific requests that were made. GP&E never said to Judge Koh, Your Honor, we'd like you to construe the word pager and provide more guidance on that. Instead, it was making different arguments. One was it wanted Judge Koh to instruct the jury that a device could be both a pager and a cell phone. But that's what the whole fact dispute was before the jury. The products we're talking about are Apple's iPhones and iPads and we weren't saying that it's a cell phone. Our argument was that it can't meet the claim construction of Node because it's a telephone that operates on a telephone network and that's different from a paging system. And everybody agreed, including GP&E's expert, that telephone networks and paging networks are two different things. So what Apple's presentation was at trial was explaining there are differences between paging networks and telephone networks and the reason Apple's products can't meet the claim construction of Node is because when they're functioning on the GPRS and LTE networks, which were the only accused networks, that they're operating on a telephone system. So what actually was the factual issue at trial? If the claim construction required this and no more, namely that a device covered by the claim had to, as programmed, operate on a network that is a telephone network, what was the factual issue? So the primary factual issue was whether Apple's iPhones and iPads, when they're using the GPRS and LTE protocols, which are industry standards, whether they're communicating on paging systems or telephone networks. And GP&E's expert agreed these are two different types of networks. So Apple presented evidence showing that the GPRS and LTE protocols that are used by Apple's products are working on telephone networks. And they showed this by explaining that the systems use different frequencies, different protocols, different bandwidths, different power. And Apple showed that the networks were not independent. And GP&E's expert actually agreed with this. At trial, GP&E's expert agreed that the GSM is a telephone network, that the accused GPRS and LTE networks are built upon and share resources with that same GSM telephone network. And then GP&E's expert, Dr. Danan, admitted on cross-examination that the accused GPRS and LTE networks would, quote, fall down if the GSM telephone network were removed. That's because the accused networks are so interrelated and intertwined with the GSM telephone network that they don't operate independently. And Dr. Danan admitted that at page 828417. So even setting apart the issue of what is a pager, independent from that, GP&E agreed that the accused invention has to operate on a network that operates independently from the telephone network. That was what the inventor told the patent office was part of his invention. I was, I guess, a little uncertain whether your brief makes the argument that all of this dispute about pager is immaterial because the evidence on the operate independently allows only one finding, namely that these accused devices always operate on a network that is a telephone network. So it really doesn't matter what you call it. That's exactly right, and that's perhaps the simplest way to get to the heart of the issue here, is that the evidence was undisputed that the accused GPRS and LTE protocols can't work without the GSM telephone network, that they're intertwined with that and they would fall down if they didn't have the GSM telephone network. So regardless of whether something's called a pager or a paging system or not, the networks that are being used by the accused devices are not independent from a telephone network, and everyone agreed that GSM is a telephone network. So does that get to the heart of what they were seeking in their proposed instruction? Because the concluding sentence in their proposed instruction says a pager could transmit certain communications on a paging system that operates independently while engaging in other types of communication on the telephone network. Well, but what they never showed was that there was any communication that engaged on a paging system that's independent of the telephone network. The only accused functionality here were when the GPRS and LTE protocols are being used, and those protocols, as our expert, Dr. Wilson, testified, and as GP&E's expert, Dr. Donan, agreed, is interdependent and uses the GSM telephone network. So even though they wanted to be able to make the argument that a device could be both a pager and a cell phone, they never showed that, and they never had the evidence that showed that, particularly when we look at the operates independently requirement, because GP&E's own expert admitted on cross-examination that the GPRS and LTE networks would fall down without the telephone network component. So there's no reason why a jury could have found on this record that the accused protocols operate independently from a telephone network. So we do think that is probably the simplest way to affirm the non-infringement judgment without having to even deal with the infringement. When I was looking at the pieces of the record that I looked at, it seemed interesting to me to, well, an aspect of the testimony seemed to turn on the difference between circuit switching and packet switching and whether the networks like GSM and the telephone described in the patent was one or the other. Can you explain that? I thought, for example, Dr. Donan made a point about trying to distinguish the circuit and the packet switch network, and your Dr. Wilson referred to some re-exam prosecution history where the BTO maybe rejected that argument, but the materials at least that I looked at left me uncertain about what was going on. That's right. Our view is that the packet switching versus circuit switching has nothing to do, that that's not a way to define whether something is a pager. But ultimately this turned into a fact dispute where we had competing expert testimony where Dr. Wilson for Apple provided characteristics of how pagers work and what paging systems are and contrasted those with telephones and telephone systems. And the patent is clear that it treats telephones and pagers, telephone systems and paging networks, differently. Part of my question was whether it's clear that the patent, when it talks about telephone networks, is talking about circuit switching. No, I don't think the patent says one way or the other. And at the time of the invention, mobile telephone devices were known, including GSM, which has a combination of circuit switching and packet switching technology. I don't think there's anything in the patent that says it was making a distinction between packet switching and circuit switching. And was that a point that in reexamination the examiner or the board or somebody made? During reexamination that point that was raised by GP&A was dismissed as not relevant, and that's what Dr. Wilson referred to in the testimony at trial. But the actual reexam passages, as far as I know, are not in the appendix? I don't believe those are in the appendix. It's just Dr. Wilson's testimony about what they said. And so, again, GP&E was able to present testimony from its expert on the fact issue of whether GPRS and LTE are operating as paging systems or telephone networks. It did make an argument about circuit switch versus packet switch and trying to support that. What was the point of various questions and answers of the sort? Has anybody ever called this iPhone a pager? Well, it's relevant because GP&E is taking a technology that was described in 1994 in the first patent application and trying to apply it to modern technology that works in a completely different system. So, for example, there were ETSI documents. ETSI is the body that does the standard setting for the GPRS and LTE protocols that are used by DeepQ's products. But it also has a separate technical specification for a separate two-way paging system. So the point of some of these questions was to show that people of ordinary skill in the art, both back in 1994 at the time of the election pension as well as today, view paging systems and telephone networks as different things, and everything can be categorized as either working on a paging network or a telephone network. Here, all of the evidence that Apple pointed to show that GPRS and LTE protocols are working on a telephone network. And that's what ETSI documents and the questions about pagers versus telephones were designed to show, that it's either this type of network or that type of network. Everything we've got shows that this is a telephone network. And again, dependent on the telephone network, especially when it comes to GSM, which GP&E conceded is a telephone network. There's no comparable concession about the LTE, or was there? This concession applied for both the GPRS and LTE protocols. They both write on the GSM? Yes, and that's at page 28417 of the appendix. It addressed both GPRS as well as LTE, where Dr. Dhanan said, if you take GSM's resources, the entire U.S. network will fall down, and that was in the question referring to the LTE protocol. So he did make that admission for both accused protocols. So if there are no further questions, I will request that the Court affirm the judgment on non-infringement. Thank you. Thank you, Your Honor. Judge Toronto, I want to ask, excuse me, come back on a couple of points and give you a couple of record citations. I got nervous there for a minute. The first is the GSM packet versus switching. It's a circuit switch network. That's in the transcript, not in the J.A., but it's in the transcript at 526, 527, where Dr. Dhanan testifies that it is a circuit switch network on the GSM. Dr. Dhanan also in the J.A., 627 and 628, talks about the handheld computer art that the PTO used to satisfy the term node. And also relevant is the file history of the parent application, again, not in the J.A., but relevant is on the 7031716 file history at page 18 and 19 of the response to the final office action. There is a description of the interview between the examiner and the patentee about the distinction between node and pager, and how node is more sophisticated, and it's allowed by the written description because node captures a sophisticated device that includes in the specification, pointing to things like in column 3 and column 4, not just the pager, but the pager computer, which is in figures 2 and figures 8, and in columns 3 and 4, and in column 9 and column 10, talks about the pager computer, not just the pager, and that is in the file history of the parent application. And the parent application, I'm sorry, what was the number? 7031716. And it's on the overall file history, it starts on page 36, and it's page 18 and 19 of the response to the office action. So, and then of course, in JA 657, is when in the rule 131 declaration, where they're specifically talking about telephone switching directly, and then in the transcript at page 1275, not today, but the transcript at 1275, there is testimony on Mobitex, which is the system that BlackBerry used to use. It's a mobile data packet network. Not telephone, but it was a data packet network. And so that is the distinction that we're trying. We're talking about operating independently, we're talking about the data network that goes along with it, not the telephone, and talking, column 1, talking about picking up the telephone and calling somebody back. That is a huge distinction, especially given the other claim element here, which is the data network. And importing operate independently into the definition of node does not make any sense, given that other claim element. And I do want to come back to a couple points on this distinction between, on one hand, operate independently, and the other, pager, and whether, even if you find that pager was wrong, you can affirm on operate independently. First, we don't think operate independently should be there. Even if you do, going back to the Abbott case, this dispute was clearly about what pager is was central to the trial. It was a general verdict here. You cannot separate out one for the other. And to say that, well, we're going to overlook one because the pager, just because of operate independently, ignores the central focus where you have Apple's non-infringement expert talking about things like low power and high power, saying that a pager must be high power, that is, quote, implied by the claim construction. That's on JA 28965. Despite the fact that in column 14 of the patent, you have clearly low power devices. Why isn't all of that essentially resolved by the concession that the GSM network is a telephone network? And if you add to that the evidence, which I'm not sure is disputed, that each of the accused devices, because they use LTE and the other one, require, these particular devices require the GSM network, why doesn't that end the matter? However you characterize the network, whether it's power-based or protocol-based or whatever it is, there's a concession, GSM is that, a telephone network. Well, GSM is clearly a telephone network. Look, figure one and figure three show shared resources. So the reason why the network would, quote, fall down is because they share towers, right? It's not that the protocols are necessarily the same. It's because they share the same towers, and that's exactly what happens in figure one and figure three. So even assuming that operate independently should be in the definition of node, that still leaves open the claim scope of, well, it's different from what is in figures one and figure three, which is the sharing of the resources. So I don't think it's enough just to say that GSM by itself resolves the issue. I mean, look, you plug anything into the outlet, and you're sharing the resource of the electricity. It doesn't matter that there's a, you know, that they share a tower in this particular circumstance. And the fact that it is a pager, I'll just close with, you know, I don't mean to do a Senator, you're no John Kennedy here, but comparing it to the Alexander Graham Bell's patent, where Alexander Graham Bell used, it was improved telegraphy here. The overall context of this patent is not just a legacy pager, and the contrast that Apple made on the legacy pagers, for example, on the FCC calling it a one-way pager. It is the overall context that it is a device that can decompress and compress data, that has graphics, that has a pressure-sensitive touchpad, that is a computer, which is why the PTO can directly use that art. So thank you, Your Honor, I appreciate your time. Let me thank both sides, and the case is submitted.